586 A.2d 416

Catherine MORAN, Personal Representative for and on Behalf of the ESTATE OF Andrew MORAN, Deceased, Appellant,

v.

G. & W.H. CORSON, INC., Penn's Valley Insulation Corporation, Pacor, Armstrong Cork Co., GAF Corporation, Owens–Corning Fiberglas Co., Keene Corp., Celotex Corp., Delaware Insulation Corp., Sun Oil Company, Appellees.

Catherine MORAN, Personal Representative for and on Behalf of the ESTATE OF Andrew MORAN, Deceased,

v.

G. & W.H. CORSON, INC., Penn's Valley Insulation Corporation, Pacor, Armstrong Cork Co., GAF Corporation, Owens–Corning Fiberglas Co., Keene Corp., Celotex Corp., Delaware Insulation Corp., Sun Oil Company.

Appeal of G. & W.H. CORSON, INC.

Superior Court of Pennsylvania.

Argued May 8, 1990.

Filed Jan. 25, 1991.

104

Joseph R. McFadden, Jr., Media, for appellant in No. 2548 and appellee in No. 2597.

Matthew S. Donaldson, Jr., Media, for appellant in No. 2597 and appellee in No. 2548.

Before CAVANAUGH, ROWLEY, McEWEN, OLSZEWSKI, DEL SOLE, MONTEMURO, JOHNSON, HUDOCK and FORD ELLIOTT, JJ.

McEWEN, Judge:

These consolidated appeals have been taken from the order, entered in response to the post-trial motions filed by all parties, which (1) marked as satisfied the jury verdict for compensatory damages against all eleven defendants, including G. & W.H. Corson, Inc., Penn's Valley Insulation Corporation, and Delaware Insulation Corporation [1] (hereinafter appellees); (2) reversed a prior order which had awarded delay damages to appellant; and (3) struck the jury's verdict of punitive damages as to each of the appellees.

While we find that the order appealed from must be reversed, the compensatory damage verdict reinstated, and the case remanded for the imposition of delay damages

---

1. The appeal of Delaware Insulation Corp. has, by prior order of this Court, been dismissed without prejudice due to the automatic stay provisions of 11 U.S.C. § 362(a)(1).

pursuant to Pa.R.C.P. 238, we acknowledge the difficulty of the issues presented to the trial court and the recent direction from our Supreme Court not available at the time of the entry of the trial court's order.

Catherine Moran, (hereinafter appellant), the personal representative of the estate of Andrew Moran (hereinafter decedent), instituted this action under the Pennsylvania Wrongful Death and Survival Statutes to recover damages sustained as a result of the death of the decedent on November 1, 1973, from mesothelioma, a malignancy allegedly caused by his exposure to asbestos in insulation materials supplied to decedent's employer by the appellees.

Suit was instituted against the manufacturers and suppliers of the insulation materials containing asbestos which the decedent had been exposed to as an insulator helper, insulator, and shop fabricator at the Sun Oil Company Refinery from 1936 until his retirement in December of 1972. Prior to trial, appellant executed joint tortfeasor releases, specifically providing for any verdict to be reduced by the pro rata share of the releasee's liability, with GAF Corporation, Armstrong Cork Company, Owens–Corning Fiberglas Corporation, Philadelphia Asbestos Corporation, Keene Corporation, and Celotex Corporation. The jury subsequently returned a compensatory damage verdict against all defendants in the amount of $240,142.97.[2] Punitive damages were assessed against each defendant individually, the jury awarding $4,500,000.00 in punitive damages against the manufacturing defendants and $500,000.00 in punitive damages against the appellee distributors as follows:

$300,000 against G. & W.H. Corson, Inc.

150,000 against Delaware Insulation Corporation.

50,000 against Penn's Valley Insulation Corporation.

2. Compensatory damages were awarded jointly and severally against all defendants as follows:

| | |
|---|---|
| Wrongful Death Action | $ 21,872.97 |
| Survival Action | 198,270.00 |
| Appellant, in her own right | 20,000.00 |

■ Appellant initially argues that the trial court erred when it directed that the compensatory damage award be marked satisfied because the amount of the settlements received by appellant from the settling joint tortfeasors exceeded the amount of the compensatory damage verdict. We agree.

The Supreme Court, in *Charles v. Giant Eagle Markets*, 513 Pa. 474, 522 A.2d 1 (1987), held that a non-settling joint tortfeasor is *not* relieved of responsibility for payment of a proportionate share of damages where the consideration paid by the settling tortfeasor exceeds his or her proportionate share of damages as determined by the jury and the release provides for reduction of the verdict by the *pro rata* share of the settling joint tortfeasor. While appellees correctly assert that *Giant Eagle Markets* involved the Comparative Negligence Act, 42 Pa.C.S. § 7102, which was not applicable in the instant case,[3] we are not persuaded that the Supreme Court intended to limit the holding of *Giant Eagle* to only those cases tried under the Comparative Negligence Act. This argument, if correct, would require that the contribution rights of those defendants found liable to a plaintiff under principles of contributory negligence or strict liability would be controlled by the principles set forth in *Daugherty v. Hershberger*, 386 Pa. 367, 126 A.2d 730 (1956), while the contribution rights of defendants found liable under comparative negligence principles would be controlled by *Giant Eagle*. Such a system would create havoc and preclude settlements in a case involving multiple defendants, not all of whom were subject to comparative negligence principles.

In 1951, the Legislature passed the Uniform Contribution Among Joint Tortfeasors Act, Act of July 19, 1951, P.L. 1130, § 8, which has been substantially reenacted by the 1976 UCATA that is the current law. The 1951 Act altered the effect of a release as to nonsettling joint

---

**3.** The Comparative Negligence Act is not applicable in this case since appellant's cause of action accrued prior to June 27, 1978, the effective date of the Comparative Negligence Act. 42 Pa.C.S. § 7102.

tortfeasors. It enabled an individual to settle with one joint tortfeasor and still have recourse to the remaining tortfeasors, subject to the limitations stated in the Act. The 1951 Act provided for a right of contribution among joint tortfeasors. A joint tortfeasor was entitled to a money judgment for contribution only if he had discharged the common liability or had paid more than his pro rata share thereof. A release of one joint tortfeasor would not discharge the other tortfeasors unless provided by the release, but would reduce the claim against the other tortfeasors by the consideration paid or as stated in the release, if greater than the consideration paid. The Act specifically provided that any right of indemnity under existing law was not impaired. The law has remained unchanged by the 1976 legislation.

*Mamalis v. Atlas Van Lines, Inc.* 522 Pa. 214, 218, 560 A.2d 1380, 1382 (1989).

The Uniform Contribution Among Joint Tortfeasors Act, 42 Pa.C.S. § 8326, (hereinafter "UCATA"), was interpreted by the Supreme Court in *Daugherty v. Hershberger, supra,* as relieving a non-settling joint tortfeasor of the responsibility for payment of a proportionate share of the verdict to the extent of any consideration paid by a settling joint tortfeasor which exceeded the settling tortfeasor's proportionate share of the damages. The Supreme Court in *Giant Eagle Markets,* however, expressly repudiated *Daugherty* as "wrongly decided and ... overruled." *Charles v. Giant Eagle Markets, supra,* 513 Pa. at 482 n. 4, 522 A.2d at 5 n. 4. We believe that if the Court had intended to limit *Giant Eagle* to only those cases involving the Comparative Negligence Act, the court would have distinguished rather than overruled *Daugherty.*

█ The Comparative Negligence Act, 42 Pa.C.S. § 7102, is, by its express terms, applicable only to actions sounding in negligence. It has no applicability in cases involving strict liability. *See: McMeekin v. Harry M. Stevens, Inc.,* 365 Pa.Super. 580, 530 A.2d 462 (1987), *allo. denied,* 518 Pa. 619, 541 A.2d 746 (1988); *Svetz v. Land Tool Company,* 355

Pa.Super. 230, 237–39, 513 A.2d 403, 407 (1986), *allo. denied,* 515 Pa. 584, 527 A.2d 544 (1987); *Burgan v. City of Pittsburgh,* 115 Pa.Cmwlth. 566, 586–88, 542 A.2d 583, 593 (1988), *allo. denied,* 521 Pa. 613, 557 A.2d 344 (1989).

The UCATA, however, is applicable to joint tortfeasors regardless of the basis upon which they are found liable to the plaintiff. Thus, this Court has found that the UCATA "may properly be applied to effectuate contribution among joint tortfeasors where one tortfeasor is adjudged liable of negligence and the other liable under concepts of strict products liability." *McMeekin v. Harry M. Stevens, Inc., supra,* 365 Pa.Super. at 588, 530 A.2d at 466.

While it is unquestionable that the Comparative Negligence Act provided the impetus for the reexamination of the UCATA in *Giant Eagle,* the Supreme Court did not expressly or implicitly limit its interpretation of the UCATA to only those cases decided under comparative negligence principles. The court, while finding the comparative negligence statute "unquestionably compatible" with its holding, stated that "the UCATA, *properly interpreted,* supports our view." *Id.,* 513 Pa. at 481, 522 A.2d at 4 (emphasis supplied). It may be, as suggested by the concurring opinion of Justice Papadakos, that the Court reevaluated and discarded its former interpretation of the UCATA as a result of the *policy* embodied by the Comparative Negligence Act and not as a result of the express terms of either statute: [4]

In my view, comparative negligence was the legislative response to the inequities the law formerly imposed because of the harsh doctrine of contributory negligence. As previously noted, contributory negligence was rooted in the belief that the law was incapable of apportioning fault between plaintiffs and defendants, or among defen-

---

**4.** Justice Zappala, in his dissent, argued that "[b]y the stroke of its pen, the majority today has not only rewritten the Uniform Contribution Among Tortfeasors Act so as to render it meaningless and senseless, it has obliterated the explicit legislated right of contribution which exists among joint tortfeasors pursuant to 42 Pa.C.S. § 8324 and 42 Pa.C.S. § 7102(b)." *Giant Eagle, supra,* 513 Pa. at 496, 522 A.2d at 11, (Dissenting Opinion by Zappala, J.).

dants. That being the chief mischief to be remedied and the occasion and necessity for the statute, *it is obvious that the legislature, in enacting a comparative negligence statute, abandoned the old premise in favor of an acknowledgement that fault and liability could, in fact, be apportioned among a plaintiff and defendants.*

*Charles v. Giant Eagle Markets, supra* at 492–93, 522 A.2d at 10–11 (Concurring Opinion by Papadakos, J.) (emphasis supplied).

Restricting *Giant Eagle* to cases tried solely under comparative negligence principles, moreover, while illogical and unfair, would create absurd complexities in those cases where there are multiple defendants, some of whom are liable to the plaintiff only under principles of strict liability. The purpose of the holding in *Giant Eagle* was to encourage settlements and to permit plaintiffs, who have always borne the risk of settling with a defendant for less than that defendant's proportionate share of the damages as ultimately determined by a jury, to retain the benefit where a defendant overestimates his proportionate share of the verdict:

Appellees' concern over a windfall to the plaintiff, if appellee were to be required to pay its full pro rata share, is far overshadowed by the injustice of the result they urge. In addition to the erosion such a position would have upon a policy encouraging settlements, it is also bottomed on a fundamentally flawed premise. It assumes that the jury verdict more accurately measures the tortfeasor's obligation than that which is agreed upon between the parties by way of settlement. Such an assumption is without foundation either in reason or experience. There is no basis for concluding the jury verdict must serve as a cap on the total recovery that a plaintiff may receive. The responsibility of the settling tortfeasor should be finally resolved by the terms of the settlement.

*Charles v. Giant Eagle Markets, supra,* 513 Pa. at 478, 522 A.2d at 3.

Appellee Corson, however, in its petition for reargument, contends that our decision in *Walton v. Avco Corp.*, 383 Pa.Super. 518, 557 A.2d 372 (1989),[5] requires that the verdict be marked satisfied as a result of the amounts paid by the settling joint tortfeasors since, where pre-trial settlements exceed the compensatory verdict, the "Plaintiff does not have the option to reduce the verdict only by the *pro rata* shares of the settling defendants." Thus, Corson concludes that it has no liability to plaintiff since the plaintiff's settlements exceeded the jury's compensatory verdict. We disagree.

The joint tortfeasor releases entered into by the parties in *Walton* provided for reduction of the verdict

"by the *greater* of the amounts determined as follows:

a. The amount of the consideration paid for this release; or

b. The amount determined by the sum of the *pro rata* share of legal responsibility or legal liability [of the releases]."

*Id.*, 383 Pa.Superior Ct. at 537, 557 A.2d at 382 (emphasis supplied).

In the instant case, the appellant gave joint tortfeasor releases, providing *only* for reduction of the verdict by the releasee's *pro rata* share, to each of the following defendants in exchange for the considerations stated:

| PACOR | $13,125 |
|---|---|
| Armstrong Cork | 5,000 |
| Owens–Corning | 35,000 |
| Celotex | 65,000 |
| Keene Corp. | 65,000 |
| GAF | undisclosed |

Contrary to appellee's argument, Walton does not require that we order the verdict marked satisfied as to all defendants if the settlement amounts received by the plaintiff were equal to or greater than the amount of the compensatory damages awarded by the jury. The panel in *Walton* specifically held that "[t]he terms of Avco's release agree-

5. The Supreme Court granted allocatur in *Walton v. Avco*, 524 Pa. 599, 568 A.2d 1249 (1989), on November 27, 1989, and heard arguments in the case on April 6, 1990.

ment controls Avco's right to seek contribution from Hughes. Our result, in this regard is simply unaffected by the *Charles* decision where the parties to the settlement agreement *had merely provided that the total claim would be reduced by Giant Eagle's pro rata share of the jury verdict." Walton, supra,* 383 Pa.Super. at 541, 557 A.2d at 384 (emphasis supplied).[6]

Each of the releases in the instant case provided *only* for reduction of the verdict by the joint tortfeasor's *pro rata* share. Thus, *Walton* is inapplicable to the instant case.

While we confess experiencing some difficulty in construing the provisions of the UCATA and the holding of the Supreme Court in *Giant Eagle,* neither the holding of the Court not its salutary effect in promoting settlements can be questioned:

Contrary to the result urged by appellees, *where a release has been executed, the verdict is reduced only by the proportionate share of the settling tortfeasor.* The actual amount of the release, if it exceeds this sum, is of no consequence in the satisfaction of the judgment of the remaining defendants. The fact that the plaintiff may receive a larger dollar amount in damages than that fixed by the jury does not militate against such an approach.

*Charles v. Giant Eagle Markets, supra,* 513 Pa. at 479, 522 A.2d at 3 (emphasis supplied).

Moreover, we find the Supreme Court's reasoning in *Giant Eagle Markets* clearly applicable to cases not tried under the Comparative Negligence Act:

The respective obligations between parties to a lawsuit can be finally determined either by way of a bona fide settlement or through trial. Settlement is a valuable tool in our arsenal of dispute resolution and it should not be undermined. The obligation of a tortfeasor as determined by settlement with the plaintiff should not be

---

6. While language in *Walton* suggests that the parties have no option to determine the effect of joint tortfeasor releases in those instances where the pre-trial settlements exceed the total amount subsequently awarded by the jury, this language in *Walton* was dicta.

affected by a subsequent verdict against any of the remaining defendants. The inducements for a defendant to settle are the certainty of the agreed-upon obligation and the avoidance of the vagaries of trial. The finality of the settlement agreement is crucial. Any subsequent trial against the remaining defendants should not disturb the resolution reached between the plaintiff and the settling tortfeasor. It would be an equal disservice to a supportive settlement policy to provide a windfall to a non-settling tortfeasor where the settlement proves to be more generous than the subsequent verdict. As noted by the late Mr. Justice Musmanno, in dissent, in *Daugherty v. Hershberger*, 386 Pa. 367, 126 A.2d 730 (1956):

> To me it is absurd that a tortfeasor, because of the generosity of another person with whom he is no way associated except in fault, should by law be excused from paying what a tribunal of law has determined he should pay as a result of his own adjudicated individual wrong.

*Id.*, 386 Pa. at 377, 126 A.2d at 735. Appellees' concern over a windfall to the plaintiff, if appellee were to be required to pay its full pro rata share, is far overshadowed by the injustice of the result they urge. In addition to the erosion such a position would have upon a policy encouraging settlements, it is also bottomed on a fundamentally flawed premise. It assumes that the jury verdict more accurately measures the tortfeasor's obligation than that which is agreed upon between the parties by way of settlement. Such an assumption is without foundation either in reason or experience. There is no basis for concluding the jury verdict must serve as a cap on the total recovery that a plaintiff may receive. The responsibility of the settling tortfeasor should be finally resolved by the terms of the settlement.

*Charles v. Giant Eagle Markets, supra*, 513 Pa. at 477–78, 522 A.2d at 2–3.

■ Appellant next argues that the trial court erred in striking the verdicts against appellees, G. & W.H. Corson,

Penn's Valley, and Delaware Insulation for punitive damages, based upon the court's conclusion that the compensatory damage verdict against the appellees had been satisfied as a result of the pre-trial settlements discussed above. G & W.H. Corson, in its cross-appeal, argues, *inter alia*, that the trial court erred in submitting the issue of punitive damages to the jury since the evidence was clearly insufficient to support an award of punitive damages. Appellee Corson also argues, in the alternative, that punitive damages should not be imposed upon it in light of the fact that the corporation had been dissolved by the time of trial.

The rule of punitive damages set forth in the Restatement (Second) of Torts § 908 has been adopted in Pennsylvania. *Martin v. Johns–Manville Corp.*, 508 Pa. 154, 168–70, 494 A.2d 1088, 1096 (1985); *Feld v. Merriam*, 506 Pa. 383, 393–95, 485 A.2d 742, 747 (1984); *Chambers v. Montgomery*, 411 Pa. 339, 344–45, 192 A.2d 355, 358 (1963); *Neal v. Carey Canadian Mines, Ltd.*, 548 F.Supp. 357, 374 (E.D.Pa.1982).

> Section 908 of the Restatement provides, *inter alia:* Punitive damages are damages ... awarded against a person to punish him for his outrageous conduct and to deter him and others like him from similar conduct in the future.
>
> Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others.

Restatement (Second) of Torts, § 908(1), (2). Comment (b) to Section 908 provides that:

> [s]ince the purpose of punitive damages is not compensation of the plaintiff but punishment of the defendant and deterrence, *these damages can be awarded only for conduct for which this remedy is appropriate—which is to say, conduct involving some element of outrage similar to that usually found in crime.* The conduct must be outrageous, either because the defendant's acts are done with an evil motive or because they are done with reckless indifference to the rights of others....

Reckless indifference to the rights of others and conscious action in deliberate disregard of them (*See:* § 500) may provide the necessary state of mind to justify punitive damages.... [emphasis supplied]

Section 500 of the Restatement (Second) of Torts defines "reckless disregard" as follows:

The actor's conduct is in reckless disregard of the safety of another if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent.

Restatement (Second) of Torts § 500. The comments to this section explain, *inter alia*, that in order to be reckless, conduct

must be unreasonable; but to be reckless it must be something more than negligent. It must not only be unreasonable, but it must involve a risk of harm to others substantially in excess of that necessary to make the conduct negligent. *It must involve an easily perceptible danger of death or substantial physical harm, and the probability that it will so result must be substantially greater than is required for ordinary negligence....* [emphasis supplied].

The actor to be reckless must recognize that his conduct involves a risk substantially greater in amount than that which is necessary to make his conduct negligent. The difference between reckless misconduct and conduct involving only such a quantum of risk as is necessary to make it negligent is a difference in the degree of the risk, but this difference of degree is so marked as to amount substantially to a difference in kind.

Comments (a) and (g), Restatement (Second) of Torts § 500.

Thus, in Pennsylvania, " '[p]unitive damages will be allowed for torts committed willfully, maliciously, or so carelessly as to indicate wanton disregard for the rights of the

party injured.'" *Neal v. Carey Canadian Mines, Ltd., supra,* 548 F.Supp. at 377, *quoting Thompson v. Swank,* 317 Pa. 158, 159, 176 A. 211, 211 (1934).

Punitive damages must be based on conduct which is "'malicious', 'wanton', 'reckless', 'willful', or 'oppressive'...." [*Chambers v. Montgomery,* 411 Pa. 339, 344–345, 192 A.2d 355, 358 (1963)] *citing Hughes v. Babcock,* 349 Pa. 475, 37 A.2d 551 (1944).

Further, one must look to 'the act itself together with all the circumstances including the motive of the wrongdoers and the relations between the parties....' *Chambers v. Montgomery, supra,* 411 Pa. at 345, 192 A.2d at 358. *See also, Pittsburgh Outdoor Advertising Co. v. Virginia Manor Apartments, Inc.,* 436 Pa. 350, 260 A.2d 801 (1970).

The state of mind of the actor is vital. The act, or the failure to act, must be intentional, reckless or malicious.

*Feld v. Merriam, supra,* 506 Pa. at 395, 485 A.2d at 747–748.

G. & W.H. Corson, in challenging the jury's award of $300,000 in punitive damages against it, argues first that the evidence was insufficient to warrant submission of the issue to the jury, and secondly, that in light of the trial court's ruling that Nosroc was not a *de facto* or *de jure* corporate successor to Corson for purposes of the imposition of punitive damages, punitive damages were improperly assessed against Corson, which had been dissolved.

We need not determine whether punitive damages may be assessed against a dissolved corporation, *see, e.g., Commonwealth v. Lavelle,* 382 Pa.Super. 356, 555 A.2d 218 (1989) *allo. denied,* 524 Pa. 595, 568 A.2d 1246 (1989); Business Corporation Law, Act of May 5, 1933, P.L. 364, art. 1, §§ 1 *et seq.,* as amended by the Act of July 20, 1968, P.L. 459, No. 216, § 49, 15 P.S. § 1907, since the evidence presented by appellant was insufficient to establish the outrageous conduct necessary to submit the issue of punitive damages to the jury.

Appellant contends that the following evidence was sufficient to support an award of punitive damages against G. & W.H. Corson:

1.  John Evans, a managing agent of Corson testified that he was aware prior to his retirement (probably as early as the mid 1960's but no later than 1969 or 1970) that asbestos exposure was hazardous and caused cancer.

2.  The foregoing information was important enough to Mr. Evans for him to discuss it with one of his managers, a Mr. Hinks.

3.  Mr. Evans admitted that despite knowledge of the hazards of asbestos exposure, Corson did not provide independent warnings of such hazards to its customers, either verbally or in writing.

4.  The evidence was clear that had Mr. Evans desired to provide such warnings, he had the means to do so.

5.  Mr. Evans' argument that the warnings were not provided because he was relying upon the manufacturers to do so was rejected by the jury and was entirely inconsistent with his obligation by law under § 401 and § 402A of the Restatement.

(Brief of appellant at 18).

Contrary to the arguments of appellant, we are unable to find any support in the record for the assertion that officials or managerial employees of G. & W.H. Corson were aware in the mid 60's that exposure to asbestos fibers could result in cancer. John Evans, the vice-president of G. & W.H. Corson, testified concerning the knowledge of appellee's agents as follows:

Q.  Mr. Evans, do [sic] you know prior to your retirement in 1969 or 1970 that asbestos-containing products were hazardous to your health?

A.  I recall reading something about that in the newspapers, I think it was prior to the time I retired. I retired 15 years ago and I think I knew something about that

before I retired, but, you know, it was 15 years ago. There has been a lot in the papers recently.

\* \* \* \* \* \*

Q. Was that information you just talked about concerning the hazards of asbestos a matter of general discussion among the insulation trade prior to your retirement in 1969?

A. I would [sic] say general discussion but I do recall having one or two conversations with fellow salesmen of cement.

\* \* \* \* \* \*

Q. Mr. Evans, did you indicate earlier that you had discussed with some people at Corson the information that you had discovered prior to your retirement about the hazards of asbestos.

A. I said I had discussed that with Bob Hinks.

Q. About that knowledge?

A. A general discussion, a light general thing that I had read about in the paper or, you know, not actually getting into detail.

Q. You read about what, sir?

A. About the publicity that comes out in the paper that I told you about. That asbestos giving some kind of problems.

Q. What kind of problems did you read about that asbestos was causing?

A. I read—I say again that was 15 years ago—I am not sure what I read—that was before I retired I think—there had been some problems with I think the word was asbestosis or something like that because of breathing asbestos and that was it. I just knew that there was a problem.

Q. Did you communicate that to Mr. Hinks?

A. Yes.

Q. Now, Mr. Evans, did you as Vice–President of Corson instruct Mr. Hinks or anyone else to notify your customers about the information that you had read about?

118

A. No.

Q. Did Corson to your knowledge prior to your retirement provide any verbal warnings through the sales people to its customers about the information concerning the hazards of asbestos that you had read about?

A. No, and I would like to tell you why if I may.

Q. Yes you may.

A. Because we depended on the manufacturer, Baldwin Hill to take care of that kind of thing. We had nothing to do with the manufacturing of that or the formulation of that. I don't know how much of any asbestos is in that. I am sure there was some asbestos in it. Unless we heard from them and realized that there was a big problem, if one of my customers told me that he had read about that I would have gone right to that. I had no complaints from any customers.

Q. Mr. Evans, did you telephone Baldwin Ehret Hill and tell them what you read concerning the information about the hazards of asbestos?

A. No.

Q. Notwithstanding what you felt to be a responsibility of the manufacturer to your knowledge did Corson provide any of its customers either verbal or written warnings about the hazards that you have discussed.

A. No. I had not given any warnings.

Q. Did you, aside from what you did not receive from the manufacturer, on your behalf or on behalf of Corson, did you provide those warnings?

A. No.

Q. Did you attend, prior to your retirement, Mr. Evans, any trade meetings or associations involving insulation contractors or buyers?

A. Yes.

Q. And was Delaware Insulation Company a member of any trade group whose meetings you attended at that time?

A. No.

This evidence, offered by appellant for the purpose of establishing outrageous conduct on the part of appellee Corson, was certainly insufficient to establish the requisite reckless conduct necessary to permit the issue of punitive damages to be submitted to the jury. While appellant presented testimony by Barry Castleman concerning articles published in medical and trade journals [7] in Europe and the United States from the early nineteen hundreds through the nineteen seventies, there was no evidence that anyone at Corson knew or had reason to know of these articles or any medical research studies on the risks involved in the use of insulation materials containing asbestos.

Our Supreme Court, in *Martin v. Johns–Manville*, 508 Pa. 154, 494 A.2d 1088 (1985), held that the evidence introduced by the plaintiff Martin as to the knowledge of the defendants concerning the health hazards to which insulation workers were exposed, as a result of their use of insulation materials containing asbestos, was insufficient to permit the issue of punitive damages to be submitted to the jury. The Court in *Martin* contrasted the evidence presented by the plaintiff in *Hoffman v. Sterling Drug, Inc.*, 485 F.2d 132 (3rd Cir.1973) (evidence established that defendant knew conclusively by 1962 that chloroquine caused adverse retinal changes) and *Neal v. Carey Canadian Mines, Inc.*, *supra* (plaintiff proved that defendant took no action in response to medical consultant's recommendation that the defendant advise its employees of the known risk of contracting an asbestos-related condition), and found that in the absence of knowledge or reason to know of the hazards associated with materials containing asbestos, there was a failure "to demonstrate the culpable mental state necessary, under existing Pennsylvania law, to prove the recklessly indifferent conduct which would permit a jury to award punitive damages." *Id.*, 508 Pa. at 177, 494 A.2d at

7. Appellant did not differentiate between articles and studies dealing with the risks associated with the mining and manufacturing of raw asbestos and the risks associated with the use and application of insulation materials containing asbestos. *See and compare: Martin v. Johns–Manville, supra,* 508 Pa. at 175 n. 15, 494 A.2d at 1099 n. 15.

1100 (footnote omitted). *Cf. Neal v. Carey Canadian Mines, Ltd., supra* at 376–377; *Fischer v. Johns–Manville Corp.*, 103 N.J. 643, 649–52, 512 A.2d 466, 469–470 (1986); *Johns–Manville Sales Corp. v. Janssens*, 463 So.2d 242, 249–250 (Fla.Dist.Ct.App.1984).

That portion of the order which struck the punitive damage award against Corson is, therefore, affirmed.[8]

■ Appellant also argues that the trial court erred in reversing, in response to post-trial motions, its earlier order imposing delay damages pursuant to Pa.R.C.P. 238. We are constrained to agree by reason of the revisions effected by the Supreme Court upon Rule 238 since the ruling of the trial court was entered and this appeal taken.

The trial court, noting that appellees had preserved the issue of the propriety of delay damages, sought to apply the guidelines announced by the Supreme Court in *Craig v. Magee Memorial Rehabilitation Center*, 512 Pa. 60, 515 A.2d 1350 (1986) regarding the imposition of delay damages. The trial court concluded that "the long delay in bringing this case to trial was neither defendants' nor plaintiff's fault", and thus declined in its subsequent ruling to impose delay damages upon that portion of the compensatory damage award for which appellees were liable.

This Court, however, need not determine whether the trial court properly interpreted *Craig* since the Supreme Court, on November 7, 1988, promulgated a new Rule 238. This change, according to the Explanatory Comment to the new rule, "revises Rule 238 in light of the *Craig* decision." Subsection (f) of the new rule provides for the rule's application to actions pending on or after the effective date of this rule (November 7, 1988) in which damages for delay have not been determined. In the cases of *Staats v. Noll*, 381 Pa.Super. 162, 553 A.2d 85 (1989), and

8. Penn's Valley has not filed a cross-appeal. Nonetheless, the punitive damage award against Penn's Valley was properly stricken by the trial court since the record is similarly devoid of evidence that Penn's Valley knew or had reason to know that the materials supplied by it could cause death or serious bodily injury.

*Miller v. Wise Business Forms, Inc.,* 381 Pa.Super. 236, 553 A.2d 443 (1989) this Court en banc has determined that new Rule 238 is applicable in cases pending on appeal on the date the new rule was adopted and made effective, to the resolution of issues properly preserved and presented by the appellant. . . .

Turning to the new rule, we learn from subsection (b) that the rule's drafters specified two, and only two, periods of time to be excluded from the calculation of delay damages: "(1) any periods of time after which the defendant has made a written offer of settlement, the offer is continued in effect for at least ninety days or, until the commencement of trial, whichever first occurs, the offer is rejected by the plaintiff, and the plaintiff does not recover more than 125 percent of the offer and (2) any periods of time during which the plaintiff caused delay of the trial." *Miller v. Wise Business Forms,* 381 Pa.Super. at 241, 553 A.2d at 446.

The drafters of the new rule "have *not* allowed for the exclusion of periods of delay not caused by either party." *Id.,* 381 Pa.Superior Ct. at 241, 553 A.2d at 446; (emphasis added). In effect, Rule 238 provides for the award, in appropriate cases, of prejudgment interest. *See: Dale v. The Baltimore & Ohio Railroad Company,* 520 Pa. 96, 552 A.2d 1037 (1989).

*King v. Southeastern Pennsylvania Transportation Authority,* 383 Pa.Super. 420, 424, 557 A.2d 11, 13 (1989).

Since appellant has properly preserved and presented the issue of delay damages, pursuant to the decisions of this Court, we are constrained to remand this case for a hearing to determine the amount of delay damages to be awarded to appellant upon the compensatory verdict as to each appellee.

Appellee Corson, in its cross appeal, also argues that[9]:

9.  In light of our earlier ruling on the issue of punitive damages, we need not address argument number 3.

1. the trial court erred in refusing to direct a verdict in favor of G. & W.H. Corson as a result of the release of the manufacturing defendants;

2. the admission into evidence, over objection, of the testimony of Barry Castleman, was reversible error warranting the award of a new trial;

3. the trial court erred in its charge on punitive damages; and

4. the failure of the trial court to submit special interrogatories to the jury so as to separate the strict liability and negligence counts was reversible error requiring the award of a new trial.

■ Appellee's initial argument is predicated upon its belief that it was only secondarily liable and that the release of the manufacturing defendants who, appellee asserts, were primarily liable, operated as a matter of law to release the supplier defendants, such as appellee.

This case was tried under both negligence and strict liability theories as to all defendants. The jury returned a general verdict of joint and several liability as to all defendants, all cross-claims for contribution and/or indemnity between the defendants having been severed prior to trial.

Appellee's argument is predicated upon the *general* rule in Pennsylvania that the seller of a defective product is entitled to indemnification from the manufacturer of the product as the party primarily responsible for the defective product. *Walasavage v. Marinelli*, 334 Pa.Super. 396, 413–14, 483 A.2d 509, 518 (1984). The general rule is, however, just that—a general rule—and is applicable only in certain circumstances.

> Under our products liability law, all suppliers of a defective product in the chain of distribution, whether retailers, partmakers, assemblers, owners, sellers, lessors, or any other relevant category, are potentially liable to the ultimate user injured by the defect. *Francioni v. Gibsonia Truck Corp.*, 472 Pa. 362, 372 A.2d 736 (1977); *Grubb v. Albert Einstein Medical Center*, 255 Pa.Superior Ct. 381,

387 A.2d 480 (1978); *Kitzinger v. Gimbel Bros., Inc.,* 240 Pa.Superior Ct. 345, 368 A.2d 333 (1976). This rule of law ensures the availability of compensation to the injured party, and helps place the burden of such injury on parties who, unlike the consumer, have a better opportunity to control the defect or spread its costs through pricing. *See Berkebile v. Brantly Helicopter Corp. supra* [462 Pa. 83, 337 A.2d 893 (1975)]; *Webb v. Zern, supra* [422 Pa. 424, 220 A.2d 853 (1966)]. To further achieve these policies and to do justice among the potential defendants, Pennsylvania permits the remedies of indemnity and contribution so that as among those in the chain of distribution liability may ultimately rest with, or be shared equally among, those who can best detect, control, or prevent the defect. 42 Pa.C.S. §§ 8321–8327; *Burbage v. Boiler Engineering & Supply Co.,* 433 Pa. 319, 249 A.2d 563 (1969); *Mixter v. Mack Trucks, Inc.,* 224 Pa.Superior Ct. 313, 308 A.2d 139 (1973). Indemnity, a common-law equitable remedy, shifts the entire loss from one defendant to another. *Builders Supply Co. v. McCabe,* 366 Pa. 322, 77 A.2d 368 (1951). Contribution is codified by statute, 42 Pa.C.S. §§ 8321–8327, and requires those who have liability of a concurrent character under the relevant tort law to share the loss equally. *See Builders Supply Co. v. McCabe, supra; Globe Indemnity v. Agway Inc.,* 456 F.2d 472 (3rd Cir.1972). These remedies between defendants are available even against defendants whom the plaintiff does not sue, and their statute of limitations does not commence at the time of the plaintiff's injury. *Wnek v. Boyle,* 374 Pa. 27, 96 A.2d 857 (1953).

Indemnity, as the more drastic remedy, is "recognized in cases where community opinion would consider that in justice the responsibility should rest upon one [defendant] rather than the other." W. Prosser, Law of Torts 313 (4th ed. 1971) (quoted with approval in *Mixter v. Mack Trucks, Inc., supra*). Thus, indemnity is only available from those who are primarily liable to those who are

merely secondarily or vicariously liable. *Builders Supply Co. v. McCabe, supra.* To evaluate primary as against secondary liability courts have focused on factors such as active or passive negligence and knowledge of or opportunity to discover or prevent the harm. *Id.* In chain of distribution cases, where there are many levels of contact with the product, and thus several possible degrees of liability, our courts have cited with approval Restatement of Restitution § 95 (1936):

> Where a person has become liable with another for harm caused to a third person because of his negligent failure to make safe a dangerous condition of land or chattels, which was created by the misconduct of the other or which, as between the two, it was the other's duty to make safe, he is entitled to restitution from the other for expenditures properly made in the discharge of such liability.

*See Mixter v. Mack Trucks, Inc., supra.* The Restatement of Restitution also addresses indemnity in a chain of distribution case:

> Where a person has supplied to another a chattel which because of the supplier's negligence or other fault is dangerously defective for the use for which it is supplied and both have become liable in that to a third person injured by such use, the supplier is under a duty to indemnify the other for expenditures properly made in discharge of the claim of the third person, if the other used or disposed of the chattel in reliance upon the supplier's case and if, as between the two, such a reliance was justifiable.

Restatement of Restitution § 93(1) (1936). When adapting these standards to strict liability cases, *see Burbage v. Boiler Supply & Engineering Co., supra; Mixter v. Mack Trucks, Inc., supra,* our courts look to the facts rather than the form of liability alone, *id.,* and "view trade relations realistically rather than mythically." *Verge v. Ford Motor Co.,* 581 F.2d 384 (3rd Cir.1978). Thus in determining who may be "primarily responsible"

and required to indemnify in a products liability case, our courts have evaluated the facts in light of products liability policies, particularly by focusing on opportunity to discover or actual knowledge of the defective condition and on the relative burdens of correcting or preventing the defect. *Burbage v. Boiler Supply & Engineering Co., supra; Mixter v. Mack Trucks, Inc., supra; Verge v. Ford Motor Co., supra* (relevant facts include trade custom, relative expertise, and practicality).

*Burch v. Sears, Roebuck and Co.,* 320 Pa.Super. 444, 456–59, 467 A.2d 615, 621–623 (1983) (footnotes omitted throughout).

As previously observed, the instant case was also tried on a negligence theory as to all defendants. Thus, the general rules recited above have but limited applicability under the circumstances of this case. *See and compare: Sirianni v. Nugent Brothers, Inc.,* 509 Pa. 564, 506 A.2d 868 (1986). Since the trial court severed all claims for indemnity and/or contribution, these issues must initially be determined by the trial court. However, appellee is not entitled to have the judgment against it marked satisfied solely as a result of the releases in the instant case since the issue of appellee's own negligence was also before the jury.

■ Appellee Corson next argues that the trial court erred when it permitted Barry Castleman to testify concerning the knowledge of the medical community of asbestos related hazards. "Questions of the admission and exclusion of evidence are within the sound discretion of the trial court and will not be reversed on appeal absent an abuse of discretion." *Burch v. Sears, Roebuck and Co., supra,* 320 Pa.Super. at 455, 467 A.2d at 621.

The basic requisite for the admissibility of any evidence in a case is that it be competent and relevant. Though "relevance" has not been precisely or universally defined, the courts of this Commonwealth have repeatedly stated that evidence is admissible if, and only if, the evidence logically or reasonably tends to prove or disprove a material fact in issue, tends to make such a fact more or

less probable, or affords the basis for or supports a reasonable inference or presumption regarding the existence of a material fact. *See Martin v. Soblotney,* 502 Pa. 418, 466 A.2d 1022 (1983).

*Leonard by Myers v. Nichols Homeshield, Inc.,* 384 Pa.Super. 1, 5, 557 A.2d 743, 745 (1989), *allo. denied,* 525 Pa. 584, 575 A.2d 115 (1990). The testimony of Barry Castleman was relevant as to the knowledge of those defendants who knew or had reason to know of the articles identified in his testimony, which included the defendant manufacturers in this case. Appellees had ample opportunity to cross-examine Mr. Castleman and to establish that they had neither knowledge or reason to know of the articles discussed by Mr. Castleman. It was not, therefore, error to admit the testimony of Barry Castleman.

■ Nor do we find that it was reversible error to refuse to submit special interrogatories to the jury in light of the fact that all cross-claims for contribution and/or indemnity had seen severed prior to trial. While it might well have been preferable to have submitted such special interrogatories to the jury for use in the determination of the defendants' cross-claims, the issues submitted to the jury were neither so complex nor lengthy as to require the use of such special interrogatories. It was not, therefore, reversible error to refuse to submit special interrogatories to the jury.

■ Appellee Corson, in its petition for reargument, raises for the first time the argument that "consistent with *McMeekin* and *Walton,* this case should have been remanded for a hearing to determine the percentage responsibility of the settling and non-settling defendants. Only in that manner can it be determined what was the liability of each of the settling defendants which was extinguished by the individual releases given to them by the plaintiff." [10]

10. Appellees have referred to Sun Oil as a joint tortfeasor who settled prior to trial. It would appear that Sun Oil paid the appellant $14,590.03 in benefits pursuant to the Occupational Disease Act, which provides the sole and exclusive liability of Sun Oil. *See Barber v. Pittsburgh Corning Corporation,* 521 Pa. 29, 555 A.2d 766 (1989); *Winfree v. Philadelphia Electric Co.,* 520 Pa. 392, 396–98, 554 A.2d 485,

This argument evidences a misapprehension of the principles of comparative contribution as set forth in *McMeekin v. Harry M. Stevens, Inc., supra.* The liability of each of the settling defendants to the plaintiff was settled by the terms of the individual releases. The non-settling defendants were each jointly and severally liable to the plaintiff for their pro rata share of the verdict. The principles set forth in *McMeekin* will be relevant to the instant case if there is a subsequent proceeding for contribution and/or indemnity. The purpose of comparative contribution

> "is not a recovery for the Tort (committed against the plaintiff,) but the enforcement of an equitable duty to share liability for the wrong done".... Thus, a tortfeasor's right to receive contribution from a joint tortfeasor derives not from his liability to the claimant but rather from the equitable principle that once the joint liability of several tortfeasors has been determined, it would be unfair to impose the financial burden of the plaintiff's loss on one tortfeasor to the exclusion of the other. It matters not on which theory a tortfeasor has been held responsible for the tort committed against the plaintiff. So long as the party seeking contribution has paid in excess of his or her share of liability it would be inequitable under the Act to deny that party's right to contribution from a second tortfeasor who also contributed to the plaintiff's injury.

*McMeekin v. Harry M. Stevens, Inc., supra,* 365 Pa.Super. at 586, 530 A.2d at 465.

The principles of comparative contribution have no applicability to the instant case in its present posture. Prior to trial, all claims for contribution and indemnity were severed. No party has yet requested that the trial court proceed to determine those issues. Nor has any defendant yet been called upon to pay "in excess of [its] share." [11]

487 (1989); *LeFlar v. Gulf Creek Industrial Park No. 2,* 511 Pa. 574, 580–82, 515 A.2d 875, 879 (1986); 77 P.S. §§ 1201 *et seq.*

**11.** Since the appellees' liability to the appellant is joint and several, the appellant may collect the amount of the verdict, minus the *pro rata* share of each of the six settling defendants, from any of the appellees.

The issue of comparative contribution is, therefore, not properly before the Court at this time.

Judgment vacated. Order affirmed in part and reversed in part. Case remanded for the entry of judgment in favor of appellant and against appellees for compensatory damages and for a hearing on delay damages. Jurisdiction relinquished.

CAVANAUGH, J., concurs in the result.

OLSZEWSKI and MONTEMURO, JJ., file concurring and dissenting opinions.

OLSZEWSKI, Judge, concurring and dissenting:

I agree with the well reasoned, scholarly opinion of the majority concerning the interpretation of the UCATA and the applicability of the holding in *Charles v. Giant Eagle Markets*, 513 Pa. 474, 522 A.2d 1 (1987), to the present case. Additionally, I concur in the analysis and result reached by the majority on the question of delay damages as well as its disposal of the arguments made by appellee Corson on cross appeal. I must dissent, however, from the majority's application of Pennsylvania law on punitive damages to the facts and evidence presented in this case.

The majority correctly states the rule of punitive damages set forth in the Restatement (Second) of Torts § 908, which has been adopted in Pennsylvania. *Martin v. Johns–Manville Corp.*, 508 Pa. 154, 168–70, 494 A.2d 1088, 1096 (1985); *Feld v. Merriam*, 506 Pa. 383, 393–95, 485 A.2d 742, 747 (1984); *Chambers v. Montgomery*, 411 Pa. 339, 344–45, 192 A.2d 355, 358 (1963); *Neal v. Carey Canadian Mines, Ltd.*, 548 F.Supp. 357, 374 (E.D.Pa.1982).

It is not necessary to set forth § 908 of the Restatement or its applicable comments at length, as the majority has done so. It is important, however, to reiterate that the section provides for an allowance of punitive damages where the defendant's conduct is outrageous, because of "his reckless indifference to the rights of others." Comment (b) to Section 908 provides, in part:

Reckless indifference to the rights of others and conscious action in deliberate disregard of them (*See:* § 500) may provide the necessary state of mind to justify punitive damages.

Section 500 of the Restatement (Second) of Torts defines "reckless disregard" as follows:

The actor's conduct is in reckless disregard of the safety of another if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent.

With respect to G. & W.H. Corson, I believe the evidence was sufficient to support an award of punitive damages under the above standard. The record indicates that the vice-president of G. & W.H. Corson testified concerning his own knowledge and the knowledge of appellee's agents of the hazards of asbestos exposure. (R. 57a–86a). This testimony establishes that officers and agents of G. & W.H. Corson were aware of the health hazards of asbestos-containing products and failed to notify or warn its customers of this danger. Likewise, Corson made no attempt to alert the manufacturer about its suspicions regarding the safeness of the product. Instead, Corson continued to distribute the product with knowledge that its users would be at a health risk and failed to disclose this risk to anyone. I believe this evidence to be sufficient to establish the requisite reckless conduct necessary to warrant submission of the issue of punitive damages to the jury.

Because the punitive damage award that was stricken by the trial court was excessive and shocking to the conscience, I would grant a new trial solely for the purpose of determining punitive damages.

MONTEMURO, Judge, concurring and dissenting:

I agree with the majority's conclusion that the evidence was insufficient to establish the requisite reckless conduct

necessary to submit the issue of punitive damages to the jury. I also agree with the majority's resolution of the issue of delay damages and appellee Corson's arguments on cross-appeal. I must dissent, however, from the majority's determination that the trial court erred in directing that the compensatory damage award be marked satisfied because the amount of the settlements received by appellant Catherine Moran from the settling joint tort-feasors exceeded the amount of the compensatory damage verdict. I believe that this Court's decision in *Walton v. Avco Corp.*, 383 Pa.Super. 518, 557 A.2d 372 (1989), *allocatur granted*, 524 Pa. 599, 568 A.2d 1249 (1989) and § 8326 of the Uniform Contribution Among Tortfeasors Act (UCATA), 42 Pa.C.S.A. § 8326, control the resolution of this issue and require that the judgment be marked satisfied as to all of the defendants.

Section 8326 of the UCATA provides:

> A release by the injured person of one joint tort-feasor, whether before or after judgment, does not discharge the other tort-feasors unless the release so provides, but reduces the claim against the other tort-feasors in the amount of the consideration paid for the release or in any amount or proportion by which the release provides that the total claim shall be reduced if greater than the consideration paid.

42 Pa.C.S.A. § 8326. In *Charles v. Giant Eagle Markets*, 513 Pa. 474, 482, 522 A.2d 1, 4 (1987), our Supreme Court noted that § 8326 "affords the parties to the release an option to determine the amount or proportion by which the total claim shall be reduced *provided that the total claim is greater than the consideration paid.*" *Id.* (emphasis added). In *Giant Eagle*, one of the joint tort-feasors (Giant Eagle) entered into a settlement agreement in which the plaintiff agreed "that any recovery that I may obtain against any ... corporation other than Giant Eagle Markets, Inc. ... shall be reduced to the extent of the pro rata share of ... Giant Eagle." *Id.*, 513 Pa. at 482, 522 A.2d at 5. The case was tried and the jury returned a verdict in

favor of the plaintiff. Although the settlement figure was less than the total jury verdict, the amount of the settlement exceeded the amount of the settling tort-feasor's proportionate share of the verdict. The nonsettling tort-feasor, Stanley Magic Door, Inc. (Stanley), argued that the verdict against it should be reduced by the amount by which Giant Eagle's settlement payment exceeded Giant Eagle's share of the verdict, that is, that the plaintiff was only entitled to receive the amount of the jury award minus the settlement payment. The Court disagreed, holding that the clear language of both the release and § 8326 required that the jury verdict be reduced only by Giant Eagle's proportionate share. *Id.*, 513 Pa. at 482, 522 A.2d at 5. Thus, Stanley was not relieved of its responsibility for payment of its proportionate share of the damages.

While the instant case is similar to *Giant Eagle* in that the releases which were executed between appellant and the settling joint tort-feasors provide that the total damages shall be reduced by the pro rata share of the settling tort-feasor's liability, *see* R.R. at 35a, 40a, 43a, 47a, 50a, 54a, I find that this case is markedly different from *Giant Eagle*, as the total amount paid in consideration of the settlements exceeds the compensatory verdict. In this regard, I find that *Walton v. Avco, supra,* is directly on point.

In *Walton*, the plaintiffs ("Waltons" and "Tinchers") sued the Avco Corporation (Avco) and the Summa Corporation (Hughes) for damages arising out of the deaths of two individuals resulting from a helicopter accident. *Id.*, 383 Pa.Super. at 522, 557 A.2d at 374. Before trial, Avco settled both the Walton and Tincher actions for settlement figures which exceeded the ultimate jury verdict entered against both Avco and Hughes. The release in *Walton* provided that the damages award would be reduced by the greater of (1) the amount of the consideration paid for the release or (2) the pro rata share of Avco's liability. On appeal, this Court rejected the Walton plaintiffs' claim that under *Giant Eagle,* they were entitled to receive from Hughes the full amount of Hughes' share of the jury

verdict and that Avco was not entitled to contribution from Hughes. *Id.,* 383 Pa.Superior Ct. at 537–38, 557 A.2d at 382. We found that no portion of Hughes' share of the jury verdict was owed to the plaintiffs, because Avco had, "by paying plaintiffs a greater settlement amount than the jury awarded to the plaintiffs as damages, 'discharged the common liability' of Avco and Hughes." *Id.,* 383 Pa.Superior Ct. at 541, 557 A.2d at 384, *citing* 42 Pa.C.S.A. § 8324(b). Relying on *Giant Eagle,* this Court stated:

> If the settlement amount exceeds the ultimate claim recovered at trial against all defendants, as in the instant case, then the parties executing a release agreement have no option as to the amount by which the judgment will be reduced. Under those circumstances, the judgment is essentially cancelled out by the previous settlement payment to the plaintiff. It is where the consideration paid for the previous release agreement is less than the total claim ultimately recovered by the plaintiff at trial, as in [*Giant Eagle* ], that the parties to a release agreement have 'the option to determine the amount or proportion by which the total claim shall be reduced.'

*Walton, supra,* 383 Pa.Super. at 541–42, 557 A.2d at 384, *quoting Giant Eagle, supra,* 513 Pa. at 482, 522 A.2d at 4. I disagree with the majority's characterization of this language as dicta, as the settlement figure in *Walton* was greater than the ultimate jury award. The majority overlooks the plain language of § 8326, which provides that parties to the release have the option to determine the amount or proportion by which the total claim shall be reduced if the claim is "greater than the consideration paid." 42 Pa.C.S.A. § 8326. Thus, although the releases in this case provided only that the verdict would be reduced by the pro rata share of the releasee's liability, and unlike the release in the *Walton* case, did not provide that the claim would be released by the amount of the consideration paid for the release, I believe that this distinction is not determinative of the outcome of this case, because under § 8326 and the *Walton* case, the parties do not have the option to

determine the amount by which the claim will be reduced where the settlement figure exceeds the jury verdict.

Consistent with *Walton* and *Giant Eagle* and the plain meaning of § 8326, I believe that appellant did not have the option to choose the amount by which the jury award would be reduced, as the amount she received in settlement of her claims exceeded the ultimate jury verdict. In paying appellant an amount greater than the jury award, the settling tort-feasors discharged the common liability of all of the defendants.

The majority's holding further conflicts with the UCATA insofar as the decision frustrates the legislative intent that settling tort-feasors who have paid more than their proportionate share have a right to contribution from the nonsettling tort-feasors. As in the *Walton* case, three of the settling tort-feasors here expressly reserved the right to contribution under the UCATA in their release agreements. *See* R.R. at 35a, 50a, 55a.[1] In *Walton,* the Court upheld the right of Avco to pursue its contribution rights against Hughes, as Avco had specifically provided in its release agreement with the plaintiffs that its involvement in the lawsuit would continue in so far as Avco retained the right to seek contribution against other liable parties. *Walton, supra,* 383 Pa.Super. at 540–41, 557 A.2d at 384. Because Avco had paid the plaintiffs a greater settlement amount than the jury award, Avco had "discharged the common liability" of all of the defendants, and thus had a right to contribution under § 8324 of the UCATA. *Id.* Although appellant and the settling tort-feasors here also agreed that the settling tort-feasors would retain their right to contribution against the nonsettling tort-feasors, the consequence of the majority's decision is to render invalid this right to contribution. If the nonsettling tort-feasors are required to pay their proportionate shares of the liability to appellant, then they cannot be required to pay contribution to the settling tort-feasors. Thus, the majority holding will inter-

1. All of the defendants' claims for contribution were severed prior to trial.

fere with the settling tort-feasors' right to contribution granted by the UCATA and expressly reserved by virtue of their release agreements.

. I believe that the policy considerations of encouraging both plaintiffs and defendants to settle, which are set forth in *Giant Eagle* and relied upon by the majority in this case, are in no way jeopardized by my conclusion that appellant is not entitled to recover the full amount of the nonsettling tort-feasors' share of the jury verdict. As the *Walton* Court stated:

> The plaintiff is encouraged to settle in view of the fact that he will recover at least the amount of the jury verdict entered against the joint defendants and perhaps a greater amount where the release consideration exceeds the total jury verdict. The nonsettling defendant, where the settling defendant has retained the right to seek contribution, has no incentive to allow the case to go to trial in hopes of securing a windfall at the settling defendant's expense. The settling defendant, who protected his contribution rights, has appropriately reached an agreement which is satisfactory to the plaintiff and has at the same time protected his own interests in a fair and reasonable manner.

*Walton, supra,* 383 Pa.Super. at 542, 557 A.2d at 384. These considerations also apply to the instant case.

For the foregoing reasons, I dissent from the majority's conclusion that under the facts of this case, the verdict should be reduced solely by the releasee's pro rata share, rather than be marked satisfied.